UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARTIN STONEMAN,

          Plaintiff,

                                 Case No. 12-15334

v.

                                 Hon. Patrick J. Duggan

THE PAUL REVERE LIFE INSURANCE
COMPANY,

          Defendant.

_____/

## OPINION AND ORDER

      This non-jury action involves a disability income insurance policy that Plaintiff Martin Stoneman purchased from Defendant The Paul Revere Life Insurance Company in 1988.  On December 5, 2012, Stoneman filed a complaint alleging that Paul Revere breached the insurance contract by denying him lifetime total disability benefits.  As relief, Stoneman seeks an order from this Court declaring that he is entitled to receive lifetime total disability benefits from Paul Revere pursuant to the terms of the insurance policy and rider as well as damages for Paul Revere's bad faith in breaching the contract.

      Presently before the Court are the parties' cross motions for summary judgment filed pursuant to Federal Rule of Civil Procedure 56 on September 3, 2013.  (Pl.'s Mot., ECF No. 18; Def.'s Mot., ECF No. 16.)  The motions require

this Court to determine whether the contractual limitations period for instituting a legal action expired prior to the initiation of this lawsuit and, if the action is timely, whether Paul Revere breached the terms of the insurance policy.  Both motions have been fully briefed and oral argument was held on December 5, 2013.  For the reasons stated herein the Court denies Paul Revere's Motion and grants Stoneman's Motion.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

## A.   The Policy and Rider

On January 2, 1988, Stoneman purchased an income replacement policy (the "Policy") from Paul Revere.  (Policy, Pl.'s Mot. Ex. 1.)  The Policy provides for two categories of income replacement benefits depending on whether the insured sustains a "Total Disability" or a "Residual Disability."  These terms are defined as follows:

> "**Total Disability**" means that because of Injury or Sickness:
>
> > a.  You are unable to perform the important duties of Your Occupation[1]; and
> >
> > b.  You are under the regular and personal care of a Physician.
>
> "**Residual Disability**", prior to the Commencement Date[2], means that due to Injury or Sickness

---

[1] The Policy defines "**Your Occupation**" as "the occupation in which You are regularly engaged at the time You become Disabled."  (Policy § 1.8, Pl.'s Mot. Ex. 1.)

2

    a.  (1) You are unable to perform one or more of the important duties of Your Occupation; or

        (2) You are unable to perform the important duties of Your Occupation for more than 80% of the time normally required to perform them; and

    b.  Your Loss of Earnings is equal to at least 20% of Your Prior Earnings while You are engaged in Your Occupation or another occupation; and

    c.  You are under the regular and personal care of a Physician.

As of the Commencement Date, Residual Disability means that due to the continuation of that Injury or Sickness[:]

    a.  Your Loss of Earnings is equal to at least 20% of Your Prior Earnings while You are engaged in Your Occupation or another occupation; and

    b.  You are under the regular and personal care of a Physician.

(Policy §§ 1.9-.10, Pl.'s Mot. Ex. 1.)

The monthly benefit amount for a period of Total Disability "is the Maximum Monthly Amount[,]" which in this case amounts to $10,200.00.  (*Id.* at § 2.1.)  The Policy provides that Paul Revere "will not pay Total Disability benefits beyond . . . [y]our 65th birthday[.]"  (*Id.* at § 1.14.)

The monthly benefit amount for Residual Disability benefits is calculated using the following formula:

---

[2] The Policy Defines "**Commencement Date**" as "the day shown on the Policy Schedule when benefits begin during a Disability."  (Policy § 1.12.)

3

<u>Loss of Earnings</u>   X   Maximum Monthly Amount
Prior Earnings

(*Id.* at § 2.2.)  "**Loss of Earnings**" means "Your Prior Earnings minus Your Monthly Earnings for the month for which Residual Disability is claimed."  (*Id.*) However, the Policy provides that "[i]f the Loss of Earnings for any month is 80% or more of Prior Earnings, We will deem the loss to be 100% of Prior Earnings." (*Id.*)  Residual Disability benefits terminate upon the insured's sixty-fifth birthday. (*Id.* at § 1.14.)

For an additional premium, Stoneman purchased a Full Total Disability Benefit for Lifetime Rider (the "Rider"), which provides for lifetime Total Disability benefits after the age of sixty-five provided three conditions are satisfied: (1) the Total Disability begins before age sixty-five; (2) the Total Disability continues until age sixty-five; and (3) the benefits under the Policy to which the Rider is attached have been paid during the period of Total Disability. (Rider, Pl.'s Mot. Ex. 2.)   In purchasing this Rider, Stoneman increased his Total Disability Maximum Benefit Period from age sixty-five to the end of his natural life.  This Rider, however, had no impact on the Maximum Benefit Period for a Residual Disability, which terminates upon the insured reaching age sixty-five.

## B.    Stoneman's Occupation

Prior to the onset of his disability, Stoneman was employed full-time as a real estate attorney and as a syndicator, owner, manager, and developer of real

estate ventures.  (Stoneman Dep. 113:22-25, May 10, 2013, Pl.'s Mot. Ex. 4;

Income Protection Claim, Pl.'s Mot. Ex. 5.)  With respect to the latter, Stoneman

engaged in "long-term, multi-faceted, multi-transactional ventures[] (i.e., 'epic'

transactions)[]" and "was also regularly involved in transactions that required

completion within extremely short time frames[] (i.e., 'short fuse' transactions)."

(Pl.'s Br. 4 (citing generally Stoneman Dep. 9-12, 41-43).)    To satisfy the

demands of these often complicated real estate transactions, Stoneman regularly

worked over sixty hours per week, and occasionally worked upwards of eighty to

ninety hours per week.  (Stoneman Dep. 151:5-17.)

     Stoneman described the duties of his job, "in order of [] importance" as

follows: "Investment evaluation, implementation and management" and

"Practicing real estate attorney."  (Job Description attach. to Income Protection

Claim, Pl.'s Mot. Ex. 5.)  Stoneman spent approximately thirty-five hours per week

on the first set of duties and spent approximately thirty hours per week on tasks

involving the practice of real estate law.  (*Id.*)  Despite the nearly even division of

time between the two categories of work, Stoneman's pre-disability income was

"generated predominately from" his role in "the acquisition, syndication,

development, ownership and management of various real estate ventures."  (Jan. 4,

2005 Letter, Pl.'s Mot. Ex. 6, *see also* Dec. 7, 2004 Letter, Pl.'s Mot. Ex. 6

(explaining that as evidenced by "the attached portion of my 2003 federal income

tax return, my earned income comes primarily from the various real estate ventures in which I am involved[]").)  By way of illustration, Stoneman's 2003 federal income tax return showed that his "income from the practice of law totaled approximately 7% of [his] total income."  (Jan. 4, 2005 Letter, Pl.'s Mot. Ex. 6.)

**C.      Stoneman's Disability and the Administration of Stoneman's Disability Claim Prior to His Sixty-Fifth Birthday**

On August 25, 2004, doctors at the Cleveland Clinic in Cleveland, Ohio diagnosed Stoneman with "very severe coronary artery disease[;]" as a result of this diagnosis, doctors performed open-heart surgery on Stoneman on September 9, 2004.  (Income Protection Claim; *see also* Operative Report attach. to Income Protection Claim.)  Dr. Julius Gardin, the physician charged with monitoring Stoneman's care upon his return to Michigan, provided the following description of Stoneman's "RESTRICTIONS (What the patient should not do)" and "LIMITATIONS (What the patient should not do)":

> Patient reports post-operative fatigue and should not return to previous reported regimen of 60-plus hour high-stress work-week.  He should rest when tired, avoid exhaustion, and reduce his workload as a means of stress management.

(Income Protection Claim 1.)

In November or December of 2004, Stoneman submitted an income protection claim pursuant to the Policy.[3]  (*Id.*; Dec. 7, 2004 Letter.)  In this claim form, signed by Stoneman on November 23, 2004, Stoneman indicated that he had returned to work on a part-time basis on October 15, 2004, working approximately fifteen to twenty hours per week.  (Income Protection Claim.)

On December 23, 2004, Paul Revere informed Stoneman that it considered him "totally disabled under [the] policy for the period August 25[], 2004 through October 15[], 2004.  It appears that you may be Residually Disabled under [the] policy from October 15[], 2004 forward.  To confirm this, we will need additional information from you."  (Dec. 23, 2004 Letter 6, Pl.'s Mot. Ex. 8.)  As Paul Revere points out, the letter set out the required proof of loss for a residual disability claim.  (*Id.*)

From the end of 2004 until July 2012, Paul Revere paid Stoneman Residual Disability benefits which equaled what Stoneman would have received if he had been classified as totally disabled.  (Def.'s Br. 8; Pl.'s Br. 7-8.)  Pursuant to the Residual Disability provisions in the Policy, "[i]f the Loss of Earnings for any month is 80% or more of Prior Earnings, We will deem the loss to be 100% of Prior Earnings."  (Policy § 2.2.)  Because Stoneman was unable to return to the portion of his pre-disability work involving "epic" and "short fuse" transactions –

---

[3] Paul Revere is a subsidiary of UnumProvident Corporation ("Unum").  Unum administrated of Stoneman's claim.  (Pl.'s Br. 5-6, 6 n.2, ECF No. 18.)

the portion that generated the vast majority of his income – Stoneman's Loss of Earnings consistently hovered around 90%. (Pl.'s Br. 7-8; Stoneman Dep. 113:22-25.) As a result, Stoneman received the "maximum monthly disability benefit[]" of $10,200.00 – the same amount he would have received had he been deemed totally disabled. (Def.'s Resps. to Pl.'s First Reqs. for Admis. ¶ 6, Pl.'s Mot. Ex. 11.) Stoneman accepted these payments without contesting Paul Revere's Residual Disability classification, although Stoneman admits that he was aware of the designation.[4] (Stoneman Dep. 120:16-17 ("Paul Revere was administering the claim as a residual disability claim[.]"); *id.* at 128:23-129:1 (acknowledging that the benefit checks provided that the payments were being paid as residual disability benefits).)

## D. Stoneman Requests Continuation of Benefits Pursuant to the Rider

In July 2012, approximately one month prior to his sixty-fifth birthday, Stoneman wrote to Paul Revere/Unum requesting that "[f]uture disability benefit payments to me under the Policy, for July 2012 and up to my 65th birthday on August 10, 2012, should be paid and treated as Total Disability benefit payments. A claim for such treatment of these benefit[s] payments is hereby made." (July 10,

---

[4] During his deposition, Stoneman explained that he did not contest the administration of the claim as a residual disability claim because (1) he was being paid one hundred percent of the benefits, (2) he "couldn't understand the difference between total disability and residual disability by reading the policy definitions, and [(3)] it was always subject to change." (Stoneman Dep. 120:16-25, Pl.'s Mot. Ex. 4.)

8

2012 Letter, Pl.'s Mot. Ex. 10.)  Stoneman also indicated that "[p]ast payments to me under the Policy should be construed as Total Disability payments."  (*Id.*)  In both the July 10 letter and an earlier letter dated July 3, 2012, Stoneman requested that Paul Revere/Unum "continue my disability income benefits, following my sixty-fifth [] birthday on August 10, 2012, in accordance with the Total Disability benefit provisions of the Policy."  (July 3, 2012 Letter, Pl.'s Mot. Ex. 10; *see also* July 10 Letter ("My claim for 'Post Age 65 Total Disability Benefits', made in furtherance of the Policy's 'Full Total Disability Benefit for Lifetime Rider', and outlined in my July 3, 2012 letter, is hereby reasserted.").)

Denying his claim on August 21, 2012, Paul Revere/Unum advised Stoneman:

> Your restrictions and limitations as documented by Dr. Gardin support that you are not able to work 60+ hours per week.  However, you report that you are engaged in your occupational duties working 25-30 hours per week, which suggests that you may not be working to your full capacity, and therefore, all of your loss of income may not be due to your reported disability. . . .
>
> The policy defines Total Disability (in part) to mean: "You are unable to perform the important duties of Your Occupation".  Since you retuned to work in October 2004[,] you have consistently demonstrated that you continue to engage in the important duties of your occupation working 25-30 hours per week. . . .

(Aug. 21, 2012 Letter 3, Pl.'s Mot. Ex. 12.)

After his request for reconsideration of the August 21, 2012 was denied, Stonemen appealed the decision denying his benefits to Paul Revere/Unum's

9

Appeals Unit.  (*See generally* Stoneman Letters, Sept. 27, 2012 to Oct. 11, 2012,

Pl.'s Mot. Ex. 13.)  After reviewing the initial denial, the Appeals Unit again

rejected Stoneman's claim, explaining that "we have determined you are

performing some of the important duties of your occupation, but for less time.

You are therefore Residually Disabled according to the policy. . . .  The fact that

you have received 100% Residual Disability benefits does not qualify you as

eligible for Total Disability. . . ."  (Nov. 12, 2012 Letter 3, Pl.'s Mot. Ex. 14.)

## E.     Initiation of Legal Proceedings

As a result of Paul Revere denying Stoneman the Total Disability lifetime

benefits he sought upon turning sixty-five, Stoneman commenced this breach of

contract action by filing a complaint with this Court on December 5, 2012.

(Compl., ECF No. 1.)  As relief, Stoneman seeks an Order from this Court

declaring that Stoneman is entitled to the lifetime total disability benefits under the

Rider.  (Pl.'s Br. 29.)  Stoneman also argues that Paul Revere's "refusal to provide

[Stoneman] the insurance benefits to which [he] is entitled has been without a

reasonable basis and in bad faith.  Therefore, pursuant to Chapter 20 of the

Michigan Insurance Code, [] Stoneman is entitled to 12% penalty interest on all

amounts awarded . . . in this action."  (Compl. ¶ 20.)

Upon the completion of discovery, both parties filed motions for summary

judgment pursuant to Federal Rule of Civil Procedure 56 on September 3, 2013.

10

(Pl.'s Mot.; Def.'s Mot.)  The parties' cross motions for summary judgment – both of which have been fully briefed – are presently before the Court.  The parties do not dispute the relevant facts as recited above; rather, the dispute centers on the legal ramifications of those facts.  In other words, the disputed issues involve the proper application of the law to the facts of this case.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 instructs courts to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (2012).  A court assessing the appropriateness of summary judgment asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co*., 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986)).

Courts evaluate cross motions for summary judgment under the same standard. *La Quinta Corp. v. Heartland Props., L.L.C.*, 603 F.3d 327, 335 (6th Cir. 2010) (citing *Beck v. City of Cleveland*, 390 F.3d 912, 917 (6th Cir. 2004)). When faced with cross motions for summary judgment, each motion is examined on its own merits.  *Id.*

## III.   ANALYSIS

Although the parties present arguments regarding the proper interpretation of the insurance policy at issue, Paul Revere's Motion for Summary Judgment suggests that Stoneman's lawsuit is time-barred.  (Def.'s Br. 2.)  Because this argument is potentially dispositive, the Court addresses the statute of limitations issue before delving into the realm of contract interpretation.

### A.     Is Stoneman's Lawsuit Time-Barred?

In "a diversity action involving an insurance contract, a federal court applies the substantive law of the forum state."  *Talley v. State Farm Fire & Cas. Co.*, 223 F.3d 323, 326 (6th Cir. 2000); *cf. Uhl v. Komatsur Forklift Co.*, 512 F.3d 294, 302 (noting that federal courts exercising diversity jurisdiction apply the law of the forum state).  Although the statute of limitations for breach of contract actions under Michigan law is six years, *see* Michigan Compiled Laws § 600.5807(8), "Michigan courts have held that insurance contracts may contain shorter statutes of limitations."  *Santino v. Provident Life & Acc. Ins. Co.*, 276 F.3d 772, 776 (6th Cir. 2001) (citing *Tom Thomas Org., Inc. v. Reliance Ins. Co.*, 396 Mich. 588, 592, 242 N.W.2d 396, 397 (1970)).

Under the Policy at issue, an insured is required to submit written proof of loss within ninety days of the period for which benefits are claimed, and any legal

12

action brought more than three years after the proof-of-loss date is time-barred.

The pertinent Policy language provides:

### 9.4   WRITTEN PROOF OF LOSS

Written proof of lost must be sent to Us within 90 days after the end of a period for which You are claiming benefits. . . .

We can also require reasonable proof from You of Your:

> a.  Prior Earnings; and

> b.  Monthly Earnings for the month for which Disability is claimed. . . .

### 10.4  LEGAL ACTION

You cannot bring legal action within 60 days from the date written proof of loss is given.  You cannot bring it after 3 years from the date written proof of loss is required.

(Policy §§ 9.4, 10.4.)

On the basis of the foregoing language, Paul Revere contends that "the Policy's [three]-year contractual limitation period for legal actions expired in 2007 (i.e., [three] years after Paul Revere classified [Stoneman] 'residually disabled' in 2004)[.]"  (Def.'s Br. 2.)  As support, Paul Revere relies on *Santino*.

In *Santino*, the plaintiff, a physician specializing in urology, suffered an illness preventing him from providing urological patient care.  276 F.3d at 774.  In 1994, Santino submitted claims under two disability policies that provided: "No [legal] action may be brought after three years from the time written proof of loss

13

is required to be given." *Id.* (alteration in original).  On January 20, 1995, the insurer notified Santino that his illness had been classified as a "residual disability." *Id.*  According to the insurer, Santino was residually disabled because he "could still perform administrative functions" at the clinic at which he worked. *Id.*  "Santino accepted [the insurer]'s classification and began receiving 'residual disability' payments." *Id.*  However, in December of 1998, Santino filed a lawsuit, "asserting for the first time that [the insurer] should have considered his illness a 'total disability.'" *Id.*  The district court dismissed Santino's lawsuit as untimely under the limitations period set forth in the applicable policies.  *Id.*

On appeal, the United States Court of Appeals for the Sixth Circuit affirmed the district court's dismissal based on the following rationale:

> The policies require Santino to bring any claim within three years of his written proof of loss.  Santino agreed to the terms of the policies. Moreover, he accepted benefits under the policies for more than three years without complaint.   [The insurer] informed Santino of its "residual disability" determination on January 25, 1995[5] and he failed to bring his lawsuit until December 1998.   Therefore, his lawsuit is time barred.

*Id.* at 776.

---

[5] Elsewhere in the Sixth Circuit's Opinion, the panel indicates that the insurer informed Santino of its decision to classify him as residually disabled on January 20, 1995. *Santino v. Provident Life & Acc. Ins. Co.*, 276 F.3d 772, 774 (6th Cir. 2001).  The differing dates, however, do not affect the calculation of the three-year period provided in Santino's disability insurance policies and this error is therefore immaterial to the panel's holding.

Similar to *Santino*, Paul Revere argues that the basis for Stoneman's lawsuit is "that Paul Revere breached the Policy by the way it classified his disability." (Def.'s Br. 15.)  However, the fact that the *Santino* Court determined that the date of classification furnished the relevant date for limitations purposes does not mandate that this Court do so as well.  This is so because, as discussed more fully below, the Sixth Circuit (as well as the district court) neglected to analyze the actual contractual language at issue.  As Stoneman points out, Paul Revere "cannot cite any 'plain language' from the policy supporting th[e] conclusion[]" that the limitations period begins to run from the date of the initial disability classification. (Pl.'s Resp. 15, Sept. 24, 2013, ECF No. 20.)

Stoneman presents two interrelated arguments in favor of his position that the three-year limitations period has not yet expired.  First, Stoneman argues that his breach of contract claim could not have accrued until Paul Revere breached the contract, specifically, the terms of the Rider providing that Stoneman could receive total disability benefits after his sixty-fifth birthday.  (*Id.* at 8-11.)  Because "Stoneman was not even eligible for payment of benefits under the Rider until he reached age 65[,]" the argument goes, Paul Revere "first breached its contract with Mr. Stoneman (at the earliest) in its letter of August 21, 2012 by refusing – for the first time – to provide benefits under the Rider."  (*Id.* at 9 (citing Ex. 12).)

15

Second, Stoneman contends that the Policy language itself supports a finding that his claim remains viable as the disability determination was made on an ongoing basis. (*Id.* at 11-15.) In other words, because the limitations provision provides that the insured "cannot bring legal action . . . after 3 years from the date written proof of loss is required[,]" and the "[w]ritten proof of loss must be sent . . . within 90 days after the end of a period for which You are claiming benefits[,]" (Policy §§ 10.4, 9.4), claims accrue under the Policy only at the end of the period for which benefits are sought. In support of this position Stoneman relies on two more recent, albeit unpublished, cases from the Sixth Circuit: *Korn v. Paul Revere Life Ins. Co.*, 238 F. App'x 109 (June 29, 2007) (unpublished) (Batchelder, J.) and *Schaefer v. AXA Equitable Life Ins. Co.*, 345 F. App'x 87 (Sept. 2, 2009) (unpublished) (White, J.).

In *Korn*, the plaintiff filed a lawsuit on February 12, 2004 claiming that, beginning in September 2000, the defendant insurance company "had wrongfully denied him benefits under a disability insurance policy." *Korn*, 238 F. App'x at 110. In seeking dismissal under Federal Rule of Civil Procedure 12(b)(6), the insurance company argued that the three-year limitations provision contained in the policy barred plaintiff's suit. *Id.* The language of the relevant policy was similar to that in this case as "the insured was required to submit written proof of loss within 90 days of the period for which benefits were claimed, and any legal

16

action was barred after three years from that proof-of-loss date." *Id.* at 111. The lower court – viewing "the claim as limited to a singular event in September 2000[]" when the plaintiff submitted his proof of loss for that period – dismissed the plaintiff's claim as untimely as more than three years had passed between September 2000 and the February 2004 filing of the lawsuit. *Id.*

In its decision partially reversing the lower court, the Sixth Circuit indicated that "the district court correctly chose a limitations period of three (3) years, as set forth in the contract, but incorrectly viewed the claim as limited to a singular event in September 2000." *Id.* This was incorrect because the plaintiff "sought recovery of each of the periodic (monthly) payments, beginning in September 2000, and also sought a declaration that periodic payments will come due so long as he remains disabled." *Id.* The panel held that "a correct application of the three-year limitations period renders time-barred any claim for periodic benefits for which the written proof of loss was required to be submitted before February 12, 2001, i.e., more than three years prior to the filing of the complaint on February 12, 2004." *Id.*

In *Schaeffer*, the plaintiff-insured filed a lawsuit in November 2006 claiming that the defendant-insurer had miscalculated his disability benefits beginning in 1995 and 1996 under four different policies. 345 F. App'x at 90-92. Because the insurer had articulated its interpretation of the policies back in 1995 and 1996 (and

17

the plaintiff's claim to the disputed benefits was denied on the basis of this interpretation), the district court held that the claims had accrued at that time and therefore, were time-barred by the three-year limitations period. *Id.* at 92-93; *id.* at 96 ("In the instant case, the district court found that [the plaintiff]'s 'action for breach of contract accrued when Defendants advanced their interpretation of Plaintiff's benefits under the policies.'").

On appeal, the Sixth Circuit noted that "[t]he district court applied the contractual time limit to [the plaintiff]'s claims as if it were a shorter version of the statute of limitations, without examining the plain language of the provision." *Id.* at 93. The court continued: "The district court did not discuss the specific contractual language stating that no legal action shall be brought after the *expiration of the three years after the time written proof of loss is required to be furnished*." *Id.* (emphasis in original). After reviewing Michigan case law, the panel noted that courts must look at the policy language in any "accrual-based analysis." *Id.* at 96. Applying the language to the claims at issue, the court held that the district court "incorrectly found [the limitations] provision to bar [the plaintiff's] entire claim[;]" rather, the plaintiff could proceed against the insurance company "but only for benefits allegedly owed for monthly periods beginning in August 2003[, three years from the commencement of the legal action]." *Id.* at 97.

18

Stoneman suggests, and this Court agrees, that *Korn* and *Schaeffer* provide the proper framework with which to determine the applicable limitations period here. This framework lends credence to Stoneman's position that the limitations provision does not bar his claim. The Policy unambiguously provides that claims accrue at the end of the period for which benefits are sought. Because "the determination as to whether or not someone is disabled under the terms and conditions of their policy is made on an ongoing basis," (Dec. 23, 2004 Letter 7, Pl.'s Mot. Ex. 8), insureds are required to submit ongoing proofs of loss in order to continue collecting benefits. Here, Stoneman sought to have the disability determination changed prior to turning sixty-five such that he would qualify for the benefits under the Rider, benefits that became operative upon Stoneman's sixty-fifth birthday. The three-year limitations period has not run since Stoneman sought reclassification in July 2012.

Although Paul Revere argues that this case is indistinguishable from *Santino*, the Court does not agree. It is true that *Santino* involved an individual seeking reclassification, as Stoneman does here; however, Stoneman convincingly distinguishes *Santino*. First, the plaintiff in *Santino* sought to recoup disability benefits due to the allegedly improper categorization of him as residually, as opposed to totally, disabled. By contrast, Stoneman was already receiving the maximum coverage payment and is therefore not seeking to recover benefits that

19

were not previously paid.  Moreover, unlike the *Korn* and *Shaeffer* panels, the *Santino* panel failed to address the specific policy language addressing when written proof of loss was required.  Michigan law requires courts to examine the actual policy language and the Court does not believe that Paul Revere would dispute this hornbook principle of contract law.  Lastly, because both *Korn* and *Shaeffer* cited *Santino*, it cannot be argued that either panel ignored *Santino*'s holding; rather, the former cases merely underscore the importance of determining the operative limitations period by reference to the language contained in the policy at issue.

Accordingly, Paul Revere's Motion is denied to the extent it seeks dismissal on the basis of statute of limitations grounds.

**B.**  **Is Stoneman Entitled to Post-Age Sixty-Five Total Disability Payments under the Rider?**

*1.*   *Michigan Principles of Contract Interpretation*

Under Michigan law, the rules for construction of an insurance contract are the same as for any other written contract, and in interpreting insurance policies, courts are guided by well-established principles of contract construction. *McKusick v. Travelers Indem. Co.*, 246 Mich. App. 329, 332-33, 632 N.W.2d 525, 528 (2001).  In interpreting contracts, the central inquiry is to ascertain the intent of the parties.  *Keely v. Fire Ins. Exch.*, 833 F. Supp. 2d 722, 726 (E.D. Mich. 2011) (citations omitted).  Because such intent is presumed to reside in the

20

contractual language, courts must "give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Knapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 468, 663 N.W.2d 447, 453 (2003). "The policy must be enforced in accordance with its terms; therefore, if the terms of the contract are clear, [courts] cannot read ambiguities into the policy." *McKusick*, 246 Mich. App. at 332, 632 N.W.2d at 528 (citations omitted).

"The determination of whether a contract is ambiguous, thereby making extrinsic evidence admissible for interpretive purposes, is a question of law." *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 373 (6th Cit. 1998) (applying Michigan law) (citing *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1376 (6th Cir. 1994)). Courts are not empowered "to make a different contract for the parties . . . when the words used by them are clear and unambiguous and have a definite meaning." *Id.* (citation omitted). "An insurance contract is clear if it fairly admits of but one interpretation. An insurance contract is ambiguous if, after reading the entire contract, its language reasonably can be understood in differing ways." *Farm Bureau Mut. Ins. Co. v. Blood*, 230 Mich. App. 58, 61-62, 583 N.W.2d 476, 478 (1998) (citations omitted). "Ambiguities and reasonable doubts in insurance contracts are construed most favorably to the insured to maximize

coverage." *Carlyon v. Mut. of Omaha Ins. Co.*, 220 Mich. App. 444, 446, 559 N.W.2d 407, 408 (1996).

### 2.    *Parties' Arguments*

In his Motion for Summary Judgment, Stoneman contends that he "is entitled to the lifetime income protection benefits" for two reasons.  First, "[t]he Policy's definitions of 'Residual Disability' and 'Total Disability' are such that where one suffers a loss of income greater than 80%, and thus under the Policy is 'deemed' to have suffered a '100% loss of income' – the insured is totally disabled within the meaning of the Policy."  (Pl.'s Br. 3.)  Second, if Paul Revere suggests an alternative interpretation , "then the Policy definitions are ambiguous, must be construed in favor of [] Stoneman . . . for maximum coverage, and [] Stoneman is still entitled to collect . . . lifetime income protection benefits."  (*Id.*)

Conversely, in its Motion for Summary Judgment, Paul Revere argues that it "properly classified [Stoneman] 'residually,' not 'totally,' disabled because there is no genuine dispute that he is able to perform his duties as a real estate attorney and developer, albeit for fewer hours, with less intensity, and earning lower income, and has done so on average over 1,100 hours per year since October 15, 2004." (Def.'s Br. 2.)

In sum, the parties dispute whether Stoneman is entitled to lifetime total disability benefits under the terms of the Policy and Rider under circumstances in

which Stoneman is unable to perform the "epic" and "short fuse" real estate

transactions from which he derived the vast majority of his pre-disability income

but is able to perform some legal and other real estate development tasks.

### 3.    *Discussion*

Whether Stoneman is entitled to lifetime benefits under the Rider depends

upon whether Stoneman satisfies three criteria: (1) the Total Disability began

before age sixty-five; (2) the Total Disability continued until age sixty-five; and (3)

the benefits under the Policy to which the Rider is attached have been paid during

the period of Total Disability.[6]  (Rider, Pl.'s Mot. Ex. 2.)

In order to satisfy the first requirement, the Court must agree with Stoneman

that he was totally disabled prior to turning sixty-five.  In the alternative, the Court

must agree with Stoneman's suggestion that the Policy language is ambiguous and

therefore entitles Stoneman to receive Total Disability benefits pursuant to the

Rider.  Stoneman's first argument is that "[t]he Policy's definitions of 'Residual

---

[6] If the first requirement is satisfied, then there would be no dispute that the second would be as documents from Stoneman's physician indicate "that [Stoneman]'s health condition - - and its impact on his ability to perform his occupational duties - - stayed the same from March 2005 through August 2012." (Def.'s Br. 13 (citing Attending Physician Statements, Def.'s Mot. Ex. 4).)  The third requirement would also be satisfied.  If the Court finds that Stoneman became totally disabled prior to turning sixty-five and finds that he remains totally disabled, then the last element would be satisfied because although Stoneman received the Maximum Monthly Amount pursuant to the Residual Disability clause, the Maximum Monthly Amount is the same regardless of the disability classification and would thus be functionally equivalent.

Disability' and 'Total Disability' are such that where one suffers a loss of income greater than 80%, and thus under the Policy is 'deemed' to have suffered a '100% loss of income' – the insured is totally disabled within the meaning of the Policy." (Pl.'s Br. 3.)  The Court does not agree with this suggested interpretation as the Court is required to read the contract provisions together so as to avoid rendering any language surplusage.  *Knapp*, 468 Mich. at 468, 663 N.W.2d at 453. Stoneman's interpretation is too broad and would effectively render part of the Residual Disability clause nugatory in contravention of Michigan principles of contract interpretation.  This conclusion, however, does not end the Court's inquiry.

Stoneman's second argument is that "the Policy definitions are ambiguous, must be construed in favor of [] Stoneman . . . for maximum coverage, and [] Stoneman is still entitled to collect . . . lifetime income protection benefits."  (Pl.'s Br. 3.)  According to this theory, the Policy is ambiguous, at least in part, because the Policy does not define "the important duties of Your Occupation[.]"  (*Id.* at 19, 23.)  As a result, Paul Revere has determined what those important duties are and has not explained how it arrived at its conclusions.

It is important to note at the outset that Stoneman purchased an insurance policy to insure the income generated from *his* occupation.  The Policy defines "Your Occupation" as "the occupation in which You are regularly engaged at the

24

time You become Disabled."  (Policy § 1.8.)  As this language makes clear,

Stoneman's occupation influences the determination of which duties are important.

This gives rise to two interrelated issues.  First, the important duties of Stoneman's

occupation will depend, at least in part, on how broadly one defines his occupation.

Second, once the occupation is sufficiently defined, an insurer and an insured may

reach different conclusions regarding which occupational duties are important as

such a determination is vulnerable to subjectivity.

      With respect to the first issue, it is not enough to say that Stoneman was

involved in real estate and remains involved in real estate and he is therefore

residually disabled.  Under this approach, even though Stoneman was able to

return to work in some capacity, it cannot be said that his performance of some real

estate related duties automatically precludes a finding of Total Disability.  *See,*

*e.g.*, *Giddens v. Equitable Life Assurance Soc'y*, 445 F.3d 1286, 1298 (11th Cir.

2006) (holding that plaintiff-insured was not precluded from showing a total

disability despite retaining an ability to "perform a few substantial and material

duties – including, for example, selecting house plans, materials, and

subcontractors –" because "his ability to perform those tasks in isolation still

would not allow [plaintiff] to continue in his real estate development occupation

[where] he is unable to perform his entrepreneurial, financial, planning,

coordinating, and administrative duties, which were the heart of his real estate

occupation[]").  Stated slightly differently, the fact that Stoneman returned to some form of work after his surgery does not necessarily mean that Stoneman returned to his prior occupation.

In connection with this second issue, Stoneman points out that Paul Revere has unilaterally determined which occupational duties are sufficiently important. (Pl.'s Br. 19, 23.)  Given that Stoneman purchased the Policy and attendant Rider for the very purpose of insuring his income, it seems particularly relevant to examine how his income was actually generated.  *Cf. Arrigo's Fleet Serv., Inc. v. Aetna Life & Cas. Co.*, 54 Mich. App. 482, 486, 221 N.W.2d 206, 209 (1974) ("It is axiomatic that the purpose of insurance is to insure.") (citation omitted).  This examination informs the important duty determination, and, unlike other methods of deciding what the important duties of Stoneman's occupation were, this examination is capable of objective measurement.

Although Stoneman returned to work in October 2004, he was unable to put in the number of hours he did prior to his open-heart surgery and he was thus entirely precluded from engaging in the type of work he performed prior to his disability.  As a result of this inability, Stoneman suffered a dramatic income loss. Paul Revere suggests that Stoneman's reduction in hours fits within the Residual Disability definition as the Policy provides that an individual who is "unable to perform the important duties of [their o]ccupation for more than 80% of the time

26

normally required to perform them[,]" and whose Loss of Earnings is equal to at least 20% of [their] Prior Earnings" is residually disabled.  (Policy § 1.10(a)(2), (b).)  Stoneman, however, argues that "the inability to work at one's pre-disability intensity, pace, hours and energy can result in the inability to perform 'the important duties' of an occupation."  (Pl.'s Reply 7, ECF No. 23.)   For example, in *Rosenthal v. Long-Term Disability Plan of Epstein, Becker & Green, P.C.*, a federal district judge was faced with interpreting a total disability clause which provided the following definition:

> Totally disabled from the employee's own occupation or total disability from the employee's own occupation means:
>
> . . . For trial attorneys,
>
> . . . Because of an injury or sickness, the employee cannot perform the important duties of a trial attorney in the practice of law[.]

*Rosenthal*, No. CV-98-4246, 1999 U.S. Dist. LEXIS 21443, at *5 (C.D. Ca. Dec. 21, 1999) (unpublished).  The judge went on to observe that:

> [T]he record is clear that the important duties of a trial lawyer include performing to a high level under heavy stress for long hours. A trial attorney, especially an associate in a litigation firm, must be available to work for as long as necessary to meet the demands of a trial – or perhaps some other urgent matter such as a TRO or preliminary injunction hearing. One in Rosenthal's situation simply cannot walk out of her office or the court when her 8 hour day ends.

*Id.*, No. CV-98-4246, 1999 U.S. Dist. LEXIS 21443, at *24.

*Rosenthal* is persuasive in that it demonstrates the fallacy of Paul Revere's argument that a reduction of hours worked precludes a finding of Total Disability from one's specific occupation. Prior to becoming disabled, Stoneman was "regularly engaged" in a high-stress, high-pressure occupation demanding long hours and short product turnaround. After his heart surgery, Stoneman's physician recommended that he reduce the number of hours he worked each day in order to reduce his stress. As a result of this recommendation, Stoneman was unable to engage in the "epic" and "short fuse" transactions from which he derived the majority of his pre-disability income. Paul Revere acknowledged this economic reality in a document dated November 21, 2008: "the insured was employed as a Real Estate Attorney who predominately generated his income through [his real estate development and syndication activities]; not from the practice of law." (Activity Report 2, Pl.'s Mot. Ex. 7.)

In denying Stoneman's request to be classified as totally disabled, Paul Revere/Unum wrote: "Since you have returned to work in October 2004[,] you have consistently demonstrated that you continue to engage in the important duties of your occupation working 25-30 hours per week. . . ." (Aug. 21, 2012 Letter 3, Pl.'s Mot. Ex. 12.) However, just because Stoneman was performing some duties does not necessarily mean that he was performing the important duties of his pre-disability occupation. *See, e.g.*, *Dowdle v. Nat'l Life Ins. Co.*, 407 F.3d 967, 972

28

(8th Cir. 2005) (concluding that surgeon who could no longer stand long enough to perform orthopedic surgery but who could conduct office visits, see patients, read x-rays, perform IMEs, interpret data, and promote referrals was totally – not residually – disabled because he could not perform "the most important substantial and material duty" of his pre-disability occupation).

The Court agrees with Stoneman that a consistent loss of income of over eighty percent every year during an eight-year period tends to support the proposition that Stoneman was unable to perform the important duties of his occupation.  Simply stated, the vast majority of Stoneman's pre-disability income was derived from real estate activities in which he could no longer participate after the onset of his disability.  This explains why Stoneman received the Maximum Monthly Amount under the Policy even though Paul Revere had classified Stoneman as residually disabled.  The sizable income reduction here supports a finding that Stoneman cannot perform the important duties of his pre-disability occupation even though Stoneman continued to work on a reduced basis after his open heart surgery.  *See Dowdle*, 407 F.3d at 968-69 (noting that plaintiff-insured's income declined from $89,915/month to $11,700/month before affirming lower court decision finding plaintiff totally disabled and further noting that plaintiff worked six half-days per week post-disability).  That the Court agrees with Stoneman's position demonstrates that his interpretation of the Policy is a

29

reasonable one.  The Court's agreement also signals that the contract is ambiguous. *Farm Bureau Mut. Ins. Co.*, 230 Mich. App. 61-62, 583 N.W.2d at 478 ("An insurance contract is ambiguous if, after reading the entire contract, its language reasonably can be understood in differing ways.") (citations omitted).

Paul Revere argues that there is no ambiguity in the Policy because the Court must read the definition of Total Disability together with the definition of Residual Disability.  (Def.'s Resp. 8, ECF No. 21.)  In this construction, "an insured cannot be 'totally disabled' if he remains able to perform 'one or more' (or 'some,' or 'any') of the important duties of his occupation, or performs them for less time than usual[.]"  (*Id.*)  By making this argument, Paul Revere suggests that Stoneman must be unable to perform *all* of the important duties of his occupation in order to be deemed totally disabled under the Policy.[7]  "The problem for [Paul Revere] is that the Total Disability clause in [the Policy] does not identify what percentage of 'the' duties the insured must be unable to perform.  The clause does not say 'all' [important] duties or 'most' or any percentage. . . ."  *Giddens*, 445

---

[7] In effort to bolster its argument that "the important duties" must be read to mean all important duties, Paul Revere quotes another court's "common-sense analogy:" "[I]f one were to ask a third-grade student to name 'the' states of the United States, 'the only way that Johnny would get a 100 on that test is to name all 50 states. . . .'"  (Def.'s Resp. 17-18, ECF No. 21 (quoting *Berenguer v. Lincoln Nat'l Life Ins. Co.*, No. 2:06cv190, 2006 U.S. Dist. LEXIS 83172, at *55 (E.D. Va. Nov. 15, 2006) (unpublished)).)  While entertaining, this analogy fails to consider that the names of the fifty states making up the United States are capable of objective verification whereas the same cannot be said of the important duties of one's occupation.

F.3d at 1298 (rejecting defendant-insurer's effort to add the word "all" to a

disputed policy defining total disability as the inability to perform "the substantial

and material duties of your regular occupation[]").  This Court agrees with the

Eleventh Circuit's interpretation in *Giddens* where the court held that the policy at

issue was ambiguous based on the following rationale:

> We do not suggest that "all" is an unreasonable interpretation of the
> policy language, but we do say that "most" or the "majority" of the
> substantial and material duties is also a reasonable interpretation if an
> insured is unable to engage in his regular occupation as a result of his
> inability to perform most or the majority of those duties.

*Id.* (applying Georgia law); *see also Dowdle*, 407 F.3d at 970 (applying Minnesota

law to policy defining total disability as inability "to perform the material and

substantial duties of an occupation" and concluding that an ambiguity existed

because "the policies' definitions of 'total disability' are susceptible to differing

interpretations because the policies do not speak in terms of 'any,' 'all,' 'some,' or

'the most important part' of [the insured's] duties").[8]

---

[8] In support of its position, Paul Revere cites another Eighth Circuit case to
illustrate that "[t]he clear and overwhelming majority of courts . . . have held that
when 'total disability' and 'residual disability' provisions are construed together,
the phrase 'unable to perform the important duties of the insured's occupation' is
unambiguous and means that the insured is not 'totally disabled' if he remains able
to perform some of those important duties."  (Def.'s Resp. 18, ECF No. 21 (citing
*Miller v. Nw. Mut. Life Ins. Co.*, 392 F.3d 973, 977 (8th Cir. 2002).)  As the
*Dowdle* Court indicated, "[i]n *Miller*, we determined that the policy language
defining 'total disability' was not ambiguous."  *Dowdle v. Nat'l Life Ins. Co.*, 407
F.3d 967, 971 n.2 (8th Cir. 2005) (citing *Miller*, 392 F.3d at 976).  "However, the
language in *Miller* was materially different from" the language used in the policy

31

The Court does not agree with Paul Revere that a finding of ambiguity nullifies the Residual Disability clause, which defines Residual Disability as the inability "to perform one or more of the important duties of Your Occupation[.]" (Policy § 1.10.)  "Quite obviously, there is a continuum of disability.  If the insured is unable to perform only 'one or more' of many [important] occupational duties, then the insured would not be totally disabled.  Where the insured, such as [Stoneman], is unable to perform most or the majority (but not all) of the

at issue.  *Id.*  In *Miller*, the relevant policy defined an insured as "not totally disabled" when the insured "can perform one or more of the principal duties of the regular occupation."  *Id.* (quoting *Miller*, 392 F.3d at 974-75).  Therefore, *Miller* is inapposite.  As such, Paul Revere's reliance on *Canu v. National Life Insurance Co.*, No. 12-12838, 2013 U.S. Dist. LEXIS 64057 (E.D. Mich. May 6, 2013) (unpublished) (relying in part on *Miller*) is called into question.  Furthermore, Stoneman's attorney indicated at the motion hearing that the parties in *Canu* did not reference *Dowdle* in the briefs before Judge Cohn which further diminishes Paul Revere's reliance on that case.

While the Court will not distinguish each case relied upon by Paul Revere, the Court further notes that Paul Revere's reliance on *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586 (8th Cir. 2002), is unavailing.  Although *McOsker* held that to be totally disabled under the relevant policy, the plaintiff-insured "must be unable to perform any of the important duties of his position," this holding was rooted in a finding that such a construction "comports with both reason and authority."  *Id.* at 588.  The first case cited as authority is *Yahiro v. Nw. Mut. Life. Ins. Co.*, 168 F. Supp. 2d 511, 517-18 (D. Md. 2001).  However, "[u]nder Maryland law, unlike the law in some other jurisdictions [(such as Michigan)], there is no rule that an insurance contract is to be construed most strongly against the insurer."  *Yahiro*, 168 F. Supp. 2d at 514.  Given that Minnesota, like Michigan, does have such a rule of construction, *see Wanzek Const., Inc. v. Employers Ins. of Wausau*, 679 N.W.2d 322, 325 (Minn. 2004) (noting that if the insurance "policy language is ambiguous, it must be interpreted in favor of coverage[]"), *McOsker* is questionable authority.  Maryland's different rule of construction also renders Paul Revere's reliance on *Yahiro* problematic.

32

[important] duties and thus cannot engage in his regular occupation, the insured

nevertheless is totally disabled from his regular occupation, and this interpretation

does not nullify the Residual Disability clause." [9] *Giddens*, 445 F.3d at 1300-01.

The Court agrees with the concept of a continuum of disability despite Paul

Revere's suggestion that the Policy clearly articulates that residual and total

disability are mutually exclusive categories.  If Paul Revere means "all" in its Total

Disability clause, then it may amend its policies to make that simple change.  *Id.* at

1301.

    In light of the above analysis, the Court concludes that the Policy at issue is

ambiguous in that the language is susceptible to more than one reasonable

interpretation.  This finding is bolstered by Michigan case law providing that when

"a conflict of opinion" regarding interpretation of insurance contract language

arises among courts both in and out of state, the language is at least "of doubtful

meaning and requires construction."  *C. & J. Commercial Driveway v. Fid. & Fid.*

*& Guar. Fire Corp.*, 258 Mich. 624, 629-30, 242 N.W. 789, 790-91 (1932); *Mich.*

*Millers Mut. Ins. Co. v. Bronson Plating Co.*, 445 Mich. 558, 568 n.8, 519 N.W.2d

864, 869 n.8 (1994) (finding "the division of authority" over interpretation of

---

    [9] As the *Giddens* Court explained, "taking [the defendant-insurer]'s
argument to the logical extreme would nullify the Total Disability clause.  Residual
Disability, by its definition, includes the inability to perform one or more of the
material duties; a literal reading would include a total inability to perform all
duties, since all duties are clearly 'one or more' duties."  *Giddens v. Equitable Life
Assurance Soc'y*, 445 F.3d 1286, 1301 n.15 (11th Cir. 2006).

33

insurance contract language "to be instructive and to at least lend credence to the position that more than one reasonable interpretation of the term exists"), *overruled on other grounds by Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 664 N.W.2d 776 (2003). Having found that the language is ambiguous, Michigan law requires the Court to construe the Policy "most favorably to the insured to maximize coverage." *Carlyon*, 220 Mich. App. at 446, 559 N.W.2d at 408. In accordance with this rule, the Court finds that Stoneman is totally disabled and entitled to lifetime disability benefits.

## IV.    CONCLUSION AND ORDER

For the reasons set forth above, the Court **DENIES** Paul Revere's Motion for Summary Judgment in its entirety (ECF No. 16) and **GRANTS** Stoneman's Motion for Summary Judgment (ECF No. 18). Stoneman shall prepare and submit a proposed judgment consistent with this Opinion within **SEVEN DAYS**. Paul Revere shall have **SEVEN DAYS** from receipt of the proposed judgment to file any objections to the proposed judgment.

**IT IS SO ORDERED**.

Date:  December 20, 2013

                                    s/PATRICK J. DUGGAN
                                    UNITED STATES DISTRICT JUDGE

Copies to:
**Michael T. Price, Esq.**
**Keefe A. Brooks, Esq.**
**K. Scott Hamilton, Esq.**

34